**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GREGORY SCOTT HOPKINS,            )
                                  )
            Plaintiff,            )    2:22-cv-1395
                                  )
    vs.                           )
                                  )
ROCCO S. DEMAIOLO and ASHLEE      )
MANGAN,                           )
                                  )
            Defendants.           )

## OPINION

In 1979, someone murdered Janet Walsh.  The police investigated, interviewed suspects, but ultimately couldn't build a case to charge any of their five suspects.  The case went cold.  Then, roughly 30 years later, the Pennsylvania State Police reopened the case after receiving a federal grant.  They used new technology to test old evidence and, after finding DNA and matching the DNA profile to a former suspect, focused their investigation on Scott Hopkins.  Mr. Hopkins was eventually arrested, tried, convicted, and sentenced for the murder of Ms. Walsh.  Mr. Hopkins spent eight years in prison, until in 2020, when he was released after his conviction was overturned and the Commonwealth of Pennsylvania decided not to retry the case.

After his release and claiming he was wrongfully convicted, Mr. Hopkins brought this suit against the two arresting officers and the serologist who tested the pieces of evidence from the crime scene.  Mr. Hopkins, suing under 42 U.S.C. § 1983, alleges three constitutional violations.  His first claim is for malicious prosecution, his second for fabrication of evidence, and his third for a conspiracy to violate his rights.  Before the Court are Defendants' motions for summary judgment,[1] and Mr.

---

[1] Mr. Hopkins and Defendant Andrew Gall recently reached a settlement, and the Court dismissed all claims against Mr. Gall.  ECF 74.  Therefore, when this opinion refers to "Defendants," it is primarily in reference to the remaining Defendants, Rocco DeMaiolo and Ashlee Mangan.

Hopkins's cross-motion for partial summary judgment.  Because Mr. Hopkins cannot meet certain elements of his claims, the Court will GRANT the Defendants' motions and DENY Mr. Hopkins's motion.

## BACKGROUND

### I.    Factual background.

Viewed in the light most favorable to Mr. Hopkins, the facts are as follows.

In the early morning hours on September 1, 1979, 23-year-old Janet Walsh was murdered in her apartment in Monaca, Pennsylvania.  ECF 1 at ¶ 9; ECF 50 at 2. The night before, August 31, Ms. Walsh and a few friends went to the Getaway Lounge, a local nightclub.  ECF 1 at ¶ 11; ECF 50 at 2.  At the nightclub, Ms. Walsh danced with a stranger, a man later identified as Robert McGrail.  ECF 1 at ¶ 11; ECF 50 at 2.  Ms. Walsh left the nightclub around 2 a.m. with one of her friends and Mr. McGrail, and the three went to a local diner, Perkins.  ECF 1 at ¶ 11; ECF 50 at 2.

Once at Perkins, Ms. Walsh asked Mr. McGrail to sit at a different table, expressing worry that her husband, whom she had separated from a few months prior, might show up.  ECF 1 at ¶ 11, 35; ECF 50 at 3.  Mr. McGrail agreed and sat at a different table with someone from work.  Ex TT at 26.  Ms. Walsh's friend left around 4 a.m., and Ms. Walsh left shortly after.  ECF 1 at 11; ECF 50 at 3.  Ms. Walsh's body was found later that morning after she didn't show up to work.  ECF 1 at ¶ 12; ECF 50 at 3.

Ms. Walsh was dead on arrival.  ECF 1 at ¶¶ 14-16; ECF 50 at 4; Ex. A.  She was laying face down on her bed with a bedsheet covering over her.  ECF 1 at ¶¶ 14-16; ECF 50 at 4; Ex. A.  She was found wearing a nightgown top, naked from the waist down, a bandana tied around her neck, and a bathrobe belt tying her hands behind her back.  ECF 1 at ¶¶ 14-16; ECF 50 at 4; Ex. A.  The bathrobe to the belt was found at the foot of the bed.  ECF 1 at ¶¶ 14-16; ECF 50 at 4; Ex. A.

- 2 -

After Ms. Walsh's murder, Pennsylvania State Police led the investigation. ECF 1 at ¶¶ 22-32; ECF 50 at 4.  Officers examined the scene of the crime, gathered evidence, took photographs, and sent various pieces of evidence off for testing.  ECF 1 at ¶¶ 22-32; ECF 50 at 4.  The police conducted a rape kit gathering evidence from Ms. Walsh's mouth and vagina, with the results coming back negative for rape.  ECF 1 at ¶¶ 22-32; ECF 50 at 4.

The coroner determined the time of death to be approximately 5 a.m. and the cause of death to be strangulation, likely from the bandana around her neck.  ECF 1 at ¶3 30-32; ECF 50 at 4–5; Ex. RR at 216.  The police considered it a sex crime.  ECF 1 at ¶3 30-32; ECF 50 at 4–5; Ex. RR at 216.

The police lacked any physical evidence back in 1979 to tie any particular person to the crime.  But through their investigation, they identified five potential suspects: (1) Ms. Walsh's ex-husband, Scott Walsh; (2) the man from the nightclub, Robert McGrail; (3) Ms. Walsh's employer, Ronald Ciccozzi; (4) an admirer, Victor Ciccozzi; and (5) Scott Hopkins.  The Court takes each of the first four suspects in turn.[2]

A.    <u>Scott Walsh</u>

Scott and Janet Walsh separated in May 1979, roughly four months before her death.  Ex. P at 145:8-24.  Though separated and not divorced, Mr. Walsh had agreed to make monthly payments to Ms. Walsh—something that he had failed to do in the months before her death.  *Id.*  In fact, the only payment that Mr. Walsh made to Ms. Walsh was on the day that she died, when he dropped off a $75 check outside her

---

[2] Because Mr. Hopkins is facing a motion for summary judgment, the Court views the record in the light most favorable to him.  That includes the characteristics and involvement of alternative suspects.  The Court's summary here is not indicative of any involvement or potential wrongdoing on the behalf of these other suspects.

apartment.  Ex. O at 51:5-52:14.  The police considered Mr. Walsh a possibly jealous ex.  *Id.*

The night of the murder, Mr. Walsh was with his girlfriend until about 2:30 a.m., when she left him for the night.  Ex. P at 78:21-79:16.  She then called Mr. Walsh around 4 a.m.  *Id.*; Ex. SS at 141–42.  Past that phone call, Mr. Walsh did not have an alibi.  The police administered a polygraph examination to Mr. Walsh in 1979 to determine his whereabouts that night, and the test indicated that Mr. Walsh was "deceptive" when answering questions related to his involvement in the murder.  Ex. 4.

B.      Robert McGrail

Mr. McGrail met Ms. Walsh the night she died, dancing with her at the nightclub and then accompanying her and her friend to the diner afterward.  Ex. O at 56:3-13.  Though Mr. McGrail and Ms. Walsh did not know each other before that night, he was likely one of the last people to see Ms. Walsh alive.  *Id.*

Police found Mr. McGrail's checkbook about a week-and-a-half after the murder only a block away from Ms. Walsh's apartment.  Ex. O at 56:3-57:11.  Mr. McGrail could not explain how his checkbook got there, but the police found that: (1) the checkbook did not show any signs of weathering when found; (2) the street where they found the checkbook was rather busy; and (3) Mr. McGrail had gone out a few days later to a different nightclub near where the police found his checkbook.  *Id.*; Ex. P at 109:11-110:25.  Police concluded that Mr. McGrail did not lose his checkbook the night of the murder.  *See* Ex. O at 56:3-57:11; Ex. P at 109:11-110:25.  Back in 1979, when police asked Mr. McGrail about his potential involvement in the murder, a lie detector examination also signaled deceit in his answer denying any involvement.  Ex. O at 59:4-6.

### C.    Ronald Ciccozzi

Ronald Ciccozzi was Ms. Walsh's boss.  Ex. 1 at ¶ 12; ECF 50 at 3.  He called Ms. Walsh's family when she did not show up for work, which eventually led to the discovery of her body.  Ex. 1 at ¶ 12.  He had a prior sexual history with Ms. Walsh, and he had possibly fired a prior employee who had denied his advances.  Ex. P at 96:24-15, 108:12-15.

### D.    Victor Ciccozzi

Victor Ciccozzi was a local resident of Monaca, Pennsylvania, and though they share a last name, he had no relation to Ronald Ciccozzi.  Ex. O at 59:18-24.  Police received reports that Victor Ciccozzi was interested in Ms. Walsh, but that the interest wasn't mutual.  *Id.*  Even though the two had not gone out, Victor Ciccozzi had told a local waitress that he and Ms. Walsh dated.  Ex. P at 86:1-11.  The police also found evidence through speaking with some of his ex-girlfriends that he could be aggressive during sex.  *Id.* at 88:15-19.

The police investigated Victor Ciccozzi's whereabouts for the night of Ms. Walsh's murder.  They discovered that he was at the same nightclub the night of her murder, that he only lived about two blocks away from Ms. Walsh's apartment where she died, and that somebody dropped him off at his apartment around 2 a.m. and that he did not have an alibi for the rest of the night.  *Id.* at 86:15-87:19.

*****

With multiple suspects, but a lack of any concrete physical evidence connecting anyone to the scene, the case went cold.  And for the next 30 years, the case remained unsolved.  Then, in 2010, the state police received a federal grant for cold cases like Ms. Walsh's.  ECF 1 at ¶ 64; ECF 50 at 9.  Defendant Trooper Rocco DeMaiolo led the investigation, and Defendant Serologist Ashlee Mangan tested the physical evidence that the police had kept from 1979.  ECF 50 at 9-10.

E.    The physical evidence

As a serologist, Ms. Mangan tested evidence for bodily fluids.  Ex. Q at 13:22-14:6.  It's a serologist's job to identify where the bodily fluids are on given pieces of evidence, assess whether the identified bodily fluids are a suitable candidate for DNA testing, and ultimately send the appropriate pieces of evidence off for DNA testing.  *Id.*  It was not Ms. Mangan's job to conduct any DNA analysis; it was her job to prepare the evidence for DNA analysis that would ultimately be conducted by a separate department.  *Id.* at 15:6-20.

To prepare the evidence for DNA analysis in this case, Ms. Mangan first had to identify any spots on the pieces of evidence with bodily fluid.  Here, the bodily fluid was sperm.  *Id.* at 28:3-32:23.  Ms. Mangan reviewed the following pieces of evidence: the bedsheet that covered Ms. Walsh's body, the bandana around Ms. Walsh's neck, the bathrobe belt found around her hands, the nightgown top, and organic samples taken from the scene.  *Id.* at 78:2-83:24; ECF 50 at 10.  To detect any possible sperm on the evidence, Ms. Mangan scanned the evidence with a naked eye.  Ex. Q at 28:3-32:23.  Then, Ms. Mangan used an alternate light source to detect possible areas of sperm, a test meant to catch what the naked eye cannot and a test that was unavailable to investigators in 1979.  *Id.*  The police in 1979 had used only a tactile examination, referred to by some in this case as a "crunch test," where the police felt for hardened surfaces on the pieces of evidence to identify potential semen stains.  *Id.* at 30:21-32:23.  The police did not identify any potential semen on the evidence in 1979.  *Id.*  But using the new technology, Ms. Mangan identified traces of sperm previously unknown to the investigators on parts of the bedsheet, the bathrobe belt used to tie Ms. Walsh's hands, and the nightgown top that Ms. Walsh was wearing.  Ex. BB; Ex. LL.  Ms. Mangan did not detect sperm anywhere else on the evidence.  Ex. LL.

Next, Ms. Mangan had to determine whether a DNA laboratory could successfully build a profile off any of the discovered areas of sperm. To do so, Ms. Mangan scored the trace amounts of sperm from 1+ to 4+. Ex. Q at 74:4-14. The scoring is based on the number of sperm heads within the sample, but not necessarily the volume of semen in the sample. *Id.* at 99:10-17. A score of 1+ would mean that, based on the number of sperm heads, the sample would be unlikely to yield a DNA profile. *Id.* at 74:4-77:23. A score of 4+ would mean that, based on the number of sperm heads, the sample would be the most likely to yield a DNA profile. *Id.* at 79:10-14. A score of 3+ or 4+ meant that the sample was a good candidate to use and create a DNA profile. *Id.* at 77:8-79:14. The scores do not signal exactly how or how long the semen has been on any given area, although a lower score is often consistent with a piece of evidence having been washed. *Id.* A score of 4+ makes it more likely that a particular piece of evidence had not been washed since coming into contact with the semen. *Id.* at 115:19-116:3. The nightgown top and the robe belt were the two items that came back with scores of 3+ and 4+. *Id.* at 34:2-7; 81:7-12.

Lastly, Ms. Mangan sent the pieces of evidence off for DNA testing, where a DNA profile of an unidentified male was developed from the samples of the nightgown top and the bathrobe belt. Ex. Q at 83:16-84:10; Ex. EE.

F.    Testing the suspects

With this new information, and a DNA profile for an unidentified male, the police sought out the DNA from the five suspects. ECF 50 at 11. The police secured and tested DNA from Mr. Walsh, Mr. Ronald Ciccozzi, and Mr. Victor Ciccozzi.[3] ECF

---

[3] Interestingly enough, the police's investigation here led to the police solving a different cold case murder from the 1980s in the state of California. While investigating Victor Ciccozzi, the police uncovered a similarly situated murder of a woman in Whittier, California, where Mr. Ciccozzi had moved after Ms. Walsh's murder. Ex. P at 88:3-89:24. The police here reached out to the police in California to see if Mr. Ciccozzi's DNA matched the DNA in the California case. *Id.* It didn't.

50 at 11.  None of the three men's DNA matched the profile developed from the nightgown top and the bathrobe belt.  Ex. FF; Ex. CC; Ex. HH.

The police next looked into obtaining DNA samples from the remaining two suspects, Mr. McGrail and Mr. Hopkins.  Ex. T at ¶¶ 34, 46, 47.  The police obtained a voluntary sample from Mr. McGrail, and his DNA sample did not match the DNA profile from the crime scene.  Ex. KK.  Mr. Hopkins declined to give the police a voluntary sample, and the district attorney's office made the decision that there likely was not probable cause to support a warrant at that time.  Ex. T at ¶¶ 45–46.  The police ultimately tested Mr. Hopkins's DNA based on a trashed plastic cup that Mr. Hopkins had used.  Ex. X; Ex. DD.  Unlike the other samples, the DNA laboratory could not eliminate Mr. Hopkins "as a possible investigative lead" to the DNA profile from the discovered sperm.  Ex. II.  Based on that report, in December 2011, Mr. DeMaiolo prepared an application for a search warrant and received a search warrant for a DNA sample from Mr. Hopkins.  Ex. T at 50–51; Ex. Z.  That DNA sample from Mr. Hopkins matched the DNA profile from the sperm found on the nightgown top and bathrobe belt.  Ex. JJ.

G.    Scott Hopkins

In 1979, the police had first investigated Mr. Hopkins because of his relationship with Ms. Walsh.  One of Ms. Walsh's friends, Barbra Cindrich, told the police that Mr. Hopkins and Ms. Walsh had been having sexual relations in the months after her separation and before her murder.  Ex. C at 2.  The police interviewed Mr. Hopkins shortly thereafter, and he admitted as much in the interview.  Ex. F at 3.  He told police that he had seen her a couple of times, that he had been to her apartment before, and that the last time he had been over was about three or four weeks before her murder.  Ex. F at 3–4, 10.

---

But the police's inquiry caused the California police to run their evidence in the FBI's CODIS database, leading to a DNA match and a cold case solved.  *Id.*

In 1979, Mr. Hopkins told the police that he had an alibi. Ex. F. at 4. According to Mr. Hopkins, the night of August 31, 1979, two of his friends, Larry Musgraves, and his wife, Georgina Musgraves, had slept over, along with Mr. Hopkins's girlfriend, Diane St. George, who slept in the same bed as Mr. Hopkins. Ex. F at 5–6. The four got up early to prepare a pig roast. Ex. F. at 5–6.

The police spoke with Mr. Hopkins's alibi witnesses in 1979. Mr. Musgraves stated that he was up with Mr. Hopkins until roughly 1:00 a.m. the morning of September 1, and he woke up around 5:30 a.m. with Mr. Hopkins to get ready for the pig roast. Ex. H. The police spoke to Mr. Musgraves in 2012, too, after reopening the case. Mr. Musgraves again stated that he and his wife spent the night sleeping in the living room of the house while Mr. Hopkins and his girlfriend slept in the bedroom. Ex. W. Mr. Musgraves added that Mr. Hopkins was "romantically involved with several women at one time." Ex. W. Mr. Musgraves also stated that because of where he and his wife slept that night, Mr. Hopkins would have had to walk past them both to leave the house and to get back. Ex. W. Mr. Musgraves believed it would have been "impracticable," but not "impossible," for Mr. Hopkins to have snuck out that night. Ex. W.

After learning all of this, on January 28, 2012, Mr. DeMaiolo filed a criminal complaint against Mr. Hopkins for homicide, which initiated criminal proceedings against Mr. Hopkins. Ex. LL. The probable-cause affidavit listed Mr. Hopkins's known sexual history with Ms. Walsh, including that he had claimed to have not seen her in about a month, the DNA discovered from the sperm on the nightgown top and bathrobe belt found on Ms. Walsh, and the DNA match to Mr. Hopkins based on the laboratory test. *Id.* The affidavit did not include the other suspects, and it did not include Mr. Hopkins's purported alibi. *Id.* Mr. DeMaiolo, but not Ms. Mangan, signed as an affiant.

Mr. Hopkins was tried and convicted for third degree murder in 2013.  Ex. VV; Ex. TT.  He remained in prison until 2020, when his conviction was overturned on a PCRA appeal, and the Commonwealth declined to retry the case.  Ex. UU-2; ECF 50 at 18.  The Pennsylvania Superior Court overturned Mr. Hopkins's conviction, finding essentially that the prosecution's expert, Cyril Wecht, used an unreliable method with respect to his opinion that dated the deposits of Mr. Hopkins's semen at the crime scene.  Ex. UU-2 at 39–40.  This expert analysis and Dr. Wecht's opinions were not part of the police's probable-cause affidavit in bringing charges against Mr. Hopkins.  Ex. UU-2; Ex. LL; Ex. PP.

## II.     Procedural background.

Mr. Hopkins is now suing Defendants under 42 U.S.C. § 1983 for three constitutional violations arising from his prosecution.  Under Count I, Mr. Hopkins alleges that Defendants violated his Fourth Amendment right to be free from malicious prosecution.  ECF 1 at¶ 94.  Under Count II, he alleges that Defendants violated his Fourteenth Amendment right to be free from the fabrication of evidence used against him to bring about his prosecution.  *Id.* at ¶ 96.  And under Count III, he alleges that Defendants conspired to violate his rights to be free from prosecution but upon probable cause and to receive due process of law.  *Id.* at ¶ 98.  All three counts stem from the same underlying facts—the actions of Defendants and evidence that they used in filing the criminal complaint against Mr. Hopkins.  ECF 57 at 44, 47, 48.

After completing discovery, Defendants moved for summary judgment on all three counts.  ECF 49.  Defendants' briefs make the same primary arguments for why summary judgment is appropriate here, arguing that: (1) Defendants have absolute immunity from suit; (2) issue preclusion bars suit; (3) Defendants have qualified immunity that protects them here; and (4) Defendants did not violate any of Mr. Hopkins's rights.  ECF 50.  Mr. Hopkins opposes Defendants' motion in full.

Mr. Hopkins cross-moved for partial summary judgment on the specific issue of whether there was probable cause to arrest him. ECF 56. He argues that there was no probable cause. Defendants oppose his motion.

As discussed below, the Court will grant Defendants summary judgment because Mr. Hopkins hasn't provided sufficient evidence to meet certain elements of his claims.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In making this determination, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility." *Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (cleaned up). The moving party bears the initial burden to show the absence of a genuine dispute of material fact, and "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" summary judgment is improper. *Id.* (cleaned up).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment "is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (cleaned up).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018) (Conner, J.) (citations omitted). When doing so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.*

Most of the issues here revolve around whether the police had probable cause to charge Mr. Hopkins. "There is a tension inherent in evaluating probable cause at the summary judgment stage." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016). The Court must view all facts in the light most favorable to the non-movant, here Mr. Hopkins.[4] *Id.* But when assessing whether there was probable cause against Mr. Hopkins, the Court "must tolerate conflicting evidence," because "the probable cause standard by definition allows for the existence of conflicting, even irreconcilable, evidence." *Id.* The Third Circuit has instructed that, in a case like this, the Court must "view all such facts and assess whether *any* reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a 'fair probability' that a crime occurred." *Id.* (emphasis added). "Only then would the existence of conflicting evidence rise to the level of a 'genuine dispute as to any material fact' such that summary judgment would be inappropriate." *Id.*

---

[4] Because the Court is ruling favorably on Defendants' motion for summary judgment, the Court treats Mr. Hopkins as the non-moving party for purposes of its analysis.

## DISCUSSION & ANALYSIS

**I.     Defendants do not have absolute immunity.**

Defendants first argue that they are absolutely immune from suit. More specifically, they argue that they are entitled to derivate prosecutorial immunity. ECF 50 at 20. They are not.

Prosecutors have absolute immunity for "all actions performed in a 'quasi-judicial' role." *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "The decision to initiate a prosecution is at the core of a prosecutor's judicial role." *Id.* And for that reason, prosecutors are absolutely immune from liability when making the decision whether to bring charges, even where the prosecutor acts in bad faith. *Id.* at 1463–64.

The immunity doctrine is a functional one, meaning that the type of immunity available to any given defendant will often depend on the type of action and suit at issue in the case. *See Burns v. Reed*, 500 U.S. 478, 486 (1991). When a defendant functions as a prosecutor's agent, acting at the prosecutor's behest, he, too, may be absolutely immune from civil liability. *See Davis v. Grusemeyer*, 996 F.2d 617, 631 (3d Cir. 1993), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644 (3d Cir. 1998); *Richter v. Pennsylvania State Police*, No. CV 15-775, 2018 WL 2984966, at *6 (W.D. Pa. June 14, 2018) (Bissoon, C.J.). For example, the court in *Richter* held that a police officer who files criminal charges at the direction of a prosecutor is absolutely immune from suit for malicious prosecution. *Richter*, 2018 WL 2984966, at *6.

Applying this "functional test," the Court finds that Defendants were not agents of the prosecutor such that they simply carried out the DA's request or instruction. Here, Mr. DeMaiolo began criminal proceedings by filing a written complaint for criminal homicide against Mr. Hopkins. Ex. LL; Pa. R. Crim. P. 502 (stating that criminal proceedings begin when a written complaint is filed). True, he

worked with the DA, and the DA approved the charges, pursuant to the DA's policy. But approval by the DA after the fact isn't the same as direction by the DA before. The record here doesn't show that the DA directed or requested Defendants to file the criminal complaint, and so Defendants do not enjoy the absolute immunity that a prosecutor might have. *See Richter*, 2018 WL 2984966, at \*6 (finding that where a prosecutor *directs* a police officer to file charges, the prosecutor is the functional party). Absolute immunity doesn't apply.

## II. Issue preclusion doesn't apply.

Defendants next argue that summary judgment is appropriate on the basis of issue preclusion—specifically, they argue that because the state court already found in the course of Mr. Hopkins's criminal case that there was probable cause for his arrest, then that resolves the issue here, essentially dooming all the claims. Not so.

For issue preclusion to apply, the issues between the cases must be identical. *See Sarin v. Magee*, 284 F. Supp. 3d 736, 743 (E.D. Pa. 2018). They aren't. Defendants rely on *Commonwealth v. Hopkins*, arguing that the Superior Court found that there was sufficient evidence for the jury to convict Mr. Hopkins. No. 964 WDA 2014, 2015 WL 5970796, at \*2 (Pa. Super. Ct. Aug. 31, 2015); ECF 50 at 27. That issue, though, is not identical to the one before the Court, for at least two reasons.

First, the Superior Court considered sufficiency of the evidence to convict, not probable cause to arrest. Those were different issues and were based on different facts. For example, take the testimony provided at trial by Dr. Cyril Wecht—this was evidence that the Commonwealth did not use to arrest Mr. Hopkins, but evidence that the Superior Court necessarily considered. *See Hopkins*, 2015 WL 5970796, at \*35–36, \*51–53; *see Sarin*, 284 F. Supp. 3d at 743 (noting that issue preclusion didn't apply where the issues necessarily involved different factual considerations).

Second, the standard associated with the issue before the Superior Court is different than what applies now.  There, "the benefit of all reasonable inferences" went to the prosecution and the Superior Court ultimately found that the "verdict was not against the weight of the evidence because it [did] not shock the [court's] sense of justice."  *Hopkins*, 2015 WL 5970796, at \*53.  Here, however, the Court neither gives Defendants "the benefit of all reasonable inferences" nor must find a shock to the sense of justice to rule in Mr. Hopkins's favor.  *See Johnson v. Stith*, No. CV 14-5032, 2017 WL 4119584, at \*5 n.6 (D.N.J. Sept. 18, 2017) (noting that issue preclusion is inappropriate where the two standards in consideration are probable cause to arrest and the sufficiency of the evidence presented at trial), *aff'd*, 733 F. App'x 625 (3d Cir. 2018).

With no identity of issues, the Court declines to bar Mr. Hopkins's suit under issue preclusion.

## III. Defendants are entitled to summary judgment on the malicious prosecution claim.

Under the Fourth Amendment, Mr. Hopkins has a stand-alone right against malicious prosecution.  *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005).  "To prevail  in a Section 1983 malicious prosecution action, a plaintiff must show: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."  *Id.*  Mr. Hopkins's claim falls short because there was probable cause to support the warrant.

As to the first element, there's no question that Mr. DeMaiolo initiated criminal proceedings.  *See* Ex. LL; Pa. R. Crim. P. 502.  He filed the criminal complaint bringing charges against Mr. Hopkins.  Ex. LL.  Ms. Mangan is a different

story.  Her name doesn't appear on the written complaint, rather her involvement in this case was limited to her role as a serologist.  Mr. Hopkins contends that her role is enough to satisfy the first element because she improperly influenced the investigation by misrepresenting what the evidence meant.  *See* ECF 57 at 36–37.  Indeed, officers who improperly mislead investigators or conceal material information can be liable for malicious prosecution.  *See Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) ("If the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution.").  Mr. Hopkins's claims against Ms. Mangan all rise and fall on the same issue: whether her scientific work on the case materially misrepresented the evidence and what she could opine about the evidence.  That makes up a large portion of Mr. Hopkins's argument against probable cause, and so the Court will take up that issue then.  For now, the Court will proceed as if Mr. Hopkins has satisfied element one as to Ms. Mangan.

Mr. Hopkins has also satisfied elements (2) and (4).  The proceedings ended in his favor when his conviction was overturned on appeal, and he suffered a deprivation of liberty when he spent years in prison.  *See DiBella*, 407 F.3d at 601.

Whether Defendants (3) lacked probable cause and (4) acted with malice are the two elements at the heart of this dispute.  "Malice may be inferred from the absence of probable cause."  *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993).  So the Court will center its focus on the probable cause to charge Mr. Hopkins with criminal homicide.

Mr. Hopkin's "malicious prosecution claim here is premised on a false warrant application."  ECF 57 at 28.  He does not challenge that the magistrate had a substantial basis for issuing the arrest warrant based on the facts presented in the probable-cause affidavit.  *See* Ex. LL.  Thus, the Court must defer to the magistrate's finding of probable cause "unless [an] officer misrepresented material information to

get the warrant." *Pinkney v. Meadville, Pennsylvania*, 95 F. 4th 743, 748 (3d Cir. 2024).

Mr. Hopkins cannot meet either of the two elements required to vitiate the magistrate's finding of probable cause. *See Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017). First, Mr. Hopkins hasn't shown that Defendants, "with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for the warrant." *Id.* (cleaned up). Within that first element are either false statements or omissions, each meaning something different. On the one hand, false statements are made with "a reckless disregard for the truth" when an officer has "a high degree of awareness of the statements' falsity," and makes the statements anyway. *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). Omissions, on the other hand, are pieces of information that an officer leaves out from his statement that "any reasonable person would know that this was the kind of thing the judge would wish to know." *Id.* (cleaned up).

The second element that Mr. Hopkins hasn't shown is that the false statements or omissions "were material, or necessary, to the finding of probable cause." *Scuilli*, 853 F.3d at 697. (cleaned up). For this element, the Court would have to take any false statement in the probable-cause affidavit and correct it. *Russo*, 212 F.3d at 789. Then the Court would have to add any omitted statements to the affidavit. *Id.* At that point, the Court would then assess the "new" affidavit and determine whether that affidavit establishes probable cause. *Id.*

Officers need not include every detail from an investigation in a probable-cause affidavit—"[a]ll storytelling involves an element of selectivity." *Id.* at 787. But officers "cannot make unilateral decisions about the materiality of information" and only include "inculpatory evidence." *Id.* Officers must provide information sufficient to allow a neutral party to review and decide if there is a fair probability that the subject committed the crime at issue. *Id.* at 787, 789.

Mr. Hopkins provided the Court with his version of a reconstructed probable-cause affidavit, where he asserts that Defendants made a litany of false statements and omissions. Ex. 1. The Court generally groups the information that Mr. Hopkins views as false statements and omissions into six buckets: (1) the 1979 Investigation; (2) the DNA found; (3) the alternate suspects; (4) his alibi; (5) the police's impressions before gathering all the evidence; (6) the language related to the bathrobe belt; and (7) his relationship to Ms. Walsh. Taking each in turn, the Court finds that both on their own and in combination, none of the Mr. Hopkins's additions or modifications demonstrate that Defendants created materially false statements or omissions.

    A.    <u>The 1979 investigation</u>

Mr. Hopkins first argues that Defendants improperly omitted information related to the first investigation back in 1979. He argues that the police's original "crunch test," eye test, and oral and vaginal swabs producing no evidence or signs of semen should have been included in the original affidavit. Ex. 1. Because this was information absent from the original affidavit, the Court construes Mr. Hopkins's argument as these being material omissions.

These were not omissions. Police in 1979 with technology from 1979 did not identify DNA, then police in 2010 with technology from 2010 identified DNA. Why would a neutral magistrate need to know this information? More specific to the standard here, how would "any reasonable person . . . know that this was the kind of thing the judge would wish to know?" *See Russo*, 212 F.3d at 788 (cleaned up). Mr. Hopkins never offers an argument for why any reasonable person would know that a judge would want this information.

Moreover, the information isn't material. This proposed addition to the affidavit does little more than clarify what wasn't found in 1979. The proposed addition here doesn't change the fair probability that Mr. Hopkins committed this crime.

B.    The DNA found

One of Mr. Hopkins's central arguments for why the affidavit was deficient surrounds the information related to the DNA in the case.   In the affidavit, Defendants detailed that the police identified sperm "on various locations from the [physical evidence] . . . includ[ing] parts of the bed sheet that covered Ms. Walsh's body, on the white rope that bound Ms. Walsh's hands and on the light blue nightie she was wearing at the time of her death." Ex. LL.  The affidavit adds that the police developed a DNA profile based on identified sperm, and after collecting Mr. Hopkins's DNA, the police concluded that his DNA matched the DNA profile from the crime scene. *Id.*

Mr. Hopkins argues that the true scientific meaning of the evidence detailed above was misrepresented in the affidavit and Defendants omitted material scientific information.   In Mr. Hopkins's view, "[t]he original affidavit is false because no context is given to explain the inculpatory and exculpatory characteristics of the semen that was found." Ex. 57 at 30–31.

Mr. Hopkins, in his proposed reconstruction, argues that several pieces of information should have been added.  First, he argues that Defendants improperly omitted that the police could not opine as to the volume of sperm or semen identified. Ex. 1.  The police never characterized any quantity or volume of sperm found, yet Mr. Hopkins argues that they should have highlighted in the affidavit that they could not do so.  *Id.*  Second, Mr. Hopkins would have added to the affidavit that "[it is scientifically impossible to determine when or how this sperm was deposited at any given location . . . including on the physical items of evidence that were tested." Ex. 1. Mr. Hopkins believes that the police needed to add that the sperm could have gotten onto the pieces of evidence "because of direct deposit, transference, laundering, or any number of other scenarios unrelated to her death."  *Id.*  Similar to Mr. Hopkins's first proposal, the affidavit never offered how the sperm got onto the

physical pieces of evidence, just that it was there. *Id.* Because Mr. Hopkins in his proposed reconstruction only proposes additions to the affidavit here, the Court construes his argument that these statements were omissions as they relate to DNA.

The Court does not find that Defendants made any material omissions here. Any of Mr. Hopkins's proposed additions would have to be of such importance that "any reasonable person would know that this was the kind of thing the judge would wish to know." *Russo*, 212 F.3d at 789 (cleaned up). That's not the case here for a few reasons.

First, the affidavit never opined about either the volume of sperm or scientifically how the sperm got there. The affidavit does not need to affirmatively say, "here is what is not being said"; the reader can observe that. Likewise, even accepting as true Mr. Hopkins's argument that it is scientifically impossible to know how the sperm transferred onto the evidence, the affidavit does not need to explain that because the affidavit never claimed that. It would be an unworkable standard for police to include in an affidavit the scientific assertions that they are not currently making and why they are not currently making them.

Second, Mr. Hopkins has not shown that the evidence in the affidavit amounts to "junk science." *See Weimer v. County of Fayette, Pennsylvania*, 972 F.3d 177, 192 (3d Cir. 2020). For evidence to qualify as junk science and vitiate probable cause, the science would have to be so unreliable that "any reasonable official" in the officer's position would understand that by using it, she was violating the criminal defendant's rights. *See id.* (cleaned up). The affidavit references that police identified sperm on the evidence (which they used an alternate light source to do), that police developed a DNA profile from the sperm, and that police matched that DNA profile to Mr. Hopkins. Ex. LL. Importantly, Mr. Hopkins does not challenge the science behind using an alternate light source to identify sperm, the science behind building a DNA profile off sperm, or the science behind matching his DNA to the DNA profile at the

- 20 -

crime. He wanted more context behind what science could and could not say, but that argument is addressed above and does not amount to a sufficient claim of junk science being used here.

Were the Court to agree with Mr. Hopkins and find that the affidavit needed more context, the omissions would not be material. Mr. Hopkins relies on the idea that Ms. Mangan and the rest of the investigative team could not conclusively determine when or how the sperm was deposited onto the evidence. *See* Ex. Q at 66:18-25. What science could precisely say about the discovered sperm was better suited for a battle-of-the-experts at trial. Indeed, Mr. Hopkins's conviction was overturned because of shortcomings in certain expert testimony. *See generally* Ex. UU-2. But because Mr. Hopkins's expert could not show the inverse—that the evidence establishes Mr. Hopkins's sperm could *not* have been from the night of the murder—adding his proposed language would not defeat the fair probability that he did commit the murder.

Lastly, as the Court noted previously, Mr. Hopkins's suit against Ms. Mangan is based only on her role as a serologist here. His theory of liability against her is that she concealed and misrepresented material facts from Mr. DeMaiolo, namely related to the volume of sperm and how the sperm got onto the pieces of evidence. But because Mr. Hopkins's suit is predicated only on "a false warrant application," the Court's focus is only on the materials created by Ms. Mangan used in the affidavit. ECF 57 at 28; *Pinkney*, 95 F. 4th at 748. Characterizations of the evidence that Ms. Mangan might have made before the affidavit could only be misleading if the warrant itself was misleading. *See Pinkney*, 95 F. 4th at 748 (stating that the focus is on the materials in the warrant). As the Court noted above, it wasn't materially misleading for the affidavit to omit information related to volume or how the sperm got there. Thus, Ms. Mangan's work on this case was also not materially misleading. Summary judgment for Ms. Mangan is appropriate on this basis alone. *See Wilson v. Dewees*,

977 F. Supp. 2d 449, 458 (E.D. Pa. 2013) (requiring that for element one, an official who does not file charges personally must have made materially false statements or materially have misled the investigation to be liable).

The affidavit created an inference. Ms. Walsh was found in a sexual position, dressed in a nightgown top and her hands tied behind her back. Sperm was on Ms. Walsh's nightgown top and sperm was on the bathrobe belt used to tie her hands. The sperm identified was Mr. Hopkins's sperm. The inference is that Mr. Hopkins killed Ms. Walsh either during or after sexual activity. Defendants did not need to scientifically prove that the killer ejaculated onto the evidence after killing Ms. Walsh. Probable cause, "as the very name implies, . . . [deals] with probabilities." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). Probable cause does not have a strict scientific requirement, "factual and practical considerations" are okay, too. *Id.* The affidavit used science to identify Mr. Hopkins's DNA, and then it relied on practical considerations to imply how his DNA ended up on the evidence. There was probable cause to charge Mr. Hopkins as it relates to the DNA evidence.

C.    The alternate suspects

Mr. Hopkins also argues that Defendants improperly omitted any reference to the other suspects that the police had considered. Ex. 1. The Court does not find any material omissions in the affidavit as it relates to the alternative suspects.

The police do not need to conclusively eliminate any other person as a suspect to have probable cause against an individual. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). It's possible for police to have probable cause against two different suspects at the same time. *Id.* The idea that another person could have committed the crime does not "undercut" "probable cause particularized with respect to [the subject of the warrant]." *Id.*

What police cannot do is "disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause

exists." *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010) (cleaned up).  Omitting the alternate suspects would have to rise to the level of omitting "plainly exculpatory evidence" for this to be a material omission here. *See id.*  In other words, the evidence known to police at the time of Mr. Hopkins's arrest would have to plainly establish that one of the other suspects committed this crime.  That's not the case here.

None of the evidence against the other four suspects clearly establishes that they were the real perpetrator.  Viewed in the light most favorable to Mr. Hopkins, the evidence shows that other suspects may have had potential motives as previous partners of Ms. Walsh or potentially unreciprocated romantic interests in Ms. Walsh.  The evidence also shows that some suspects had opportunity as they were with Ms. Walsh the night that she died.  The evidence never plainly establishes, however, that one of the other suspects committed the crime.  The evidence does not plainly exculpate Mr. Hopkins.  For that reason, the evidence as it pertains to alternate suspects does not amount to a material omission.

D.    His alibi

Mr. Hopkins contends that omitting his alibi from the affidavit was improper.  For similar reasoning as to the evidence of alternate suspects, the Court finds that this was not a material omission.

The police are not free to disregard "plainly exculpatory evidence." *Reedy*, 615 F.3d at 214.  If Mr. Hopkins's alibi credibly established that it was impossible for him to have gone to Ms. Walsh's apartment that night, then Mr. Hopkins would be correct that to exclude the information would be to materially omit the information.  *See Goodwin v. Conway*, 836 F.3d 321, 328–29 (3d Cir. 2016) (discussing how a potential alibi that does not plainly exculpate a suspect does not destroy probable cause); *Andros v. Gross*, 294 F. App'x 731, 734–35 (3d Cir. 2008) (noting that the alibi did not destroy probable cause because it was "not flawless"); *Russo*, 212 F.3d at 792–93

(noting that a claimed alibi did not "overwhelm[]" the inculpatory evidence).  But his alibi does not amount to "plainly exculpatory evidence." *See Reedy*, 615 F.3d at 214.

Mr. Hopkins's alibi was that he was with two of his friends and a girlfriend the night of Ms. Walsh's death. *See* Ex. W.  There are three reasons why his alibi doesn't exonerate him from possibly committing the murder.  First, at 5:00 a.m., roughly the time of Ms. Walsh's murder, his friends and girlfriend were asleep. *See id.*  His friends and girlfriend could not vouch for him during the murder.  Second, his friend acknowledged that it was possible Mr. Hopkins could have left the house without him knowing. *Id.*  Mr. Hopkins's alibi did not even represent that it would be impossible for him to have committed the crime.  Third, and most importantly, police do not have to take a suspect's friends at their words when it comes to alibis.  People may incorrectly remember details, or worse, people may misrepresent details out of personal bias.  Mr. Hopkins's alibi was not so "flawless" as to amount to "plainly exculpatory evidence." *See Andros*, 294 F. App'x at 734–35.

"All storytelling involves an element of selectivity." *Russo*, 212 F.3d at 787. The Court does not find that Defendants' selection of detail, here the exclusion of Mr. Hopkins's alibi, amounts to a material omission.

E.     The police's impressions before gathering all the evidence

Next, Mr. Hopkins argues that the affidavit was deficient because it did not include the police's initial opinion that he was not a suspect and the police's belief in probable cause before gathering all the evidence.  Ex. 1.

Again, these were not omissions.  When police first reopened the case in 2010, they didn't consider Mr. Hopkins to be a suspect.  Ex. 1.  Then police uncovered his DNA on specific pieces of clothing found on the victim the night she died.  Ex. LL. Investigations develop over time, and the Court is not prepared to hold that an officer's first thought on a case before gathering new evidence is information that

"any reasonable person" would know that a judge would want in the affidavit. *See Russo*, 212 F.3d at 788 (cleaned up).

When police were attempting to match the DNA profile to a potential suspect, the DA's office did not believe that it had enough evidence to obtain a warrant for Mr. Hopkins's DNA. Ex. T at ¶¶ 45–46. That, too, is not an omission from the affidavit. The police obtained his DNA through lawful means and Mr. Hopkins doesn't argue the contrary. After matching his DNA profile to the DNA profile from the crime scene, the police's opinion on probable cause changed.

Even if these were omissions, they wouldn't be material. They don't negate the central evidence in the case against Mr. Hopkins—that his DNA profile did match the DNA profile from the crime scene.

### F.    The language related to the bathrobe belt

In the affidavit, Defendants referred to the bathrobe belt found around Ms. Walsh's hands as "white rope." Ex. LL. Mr. Hopkins contends that language should have instead read "bathrobe belt." Ex. 1. The Court interprets Mr. Hopkins's argument as this being a false statement.

Labeling the bathrobe belt a "white rope," when it was in fact made out of white rope, does not signal that Defendants acted with "a high degree of awareness of the statements' falsity." *See Russo*, 212 F.3d at 788. Mr. Hopkins's proposal would have been more precise, but the label itself is not false.

Moreover, the information is not material. The most damning evidence against Mr. Hopkins are the facts that only Mr. Hopkins's sperm DNA was found at the crime scene, and the locations where the sperm DNA was found were on the bathrobe belt used to tie Ms. Walsh's hands and the nightgown top that she was wearing. Ex. LL. That creates a fair probability that Mr. Hopkins committed this crime. Whether it was just a white rope or a white bathrobe belt doesn't change those facts.

G.      His relationship to Ms. Walsh

In the affidavit, Defendants included that Mr. Hopkins had a prior sexual relationship with Ms. Walsh and that he had not been to her apartment in about one month before her death.  Ex. LL.  Mr. Hopkins would change the "about one month" language to "in three or four weeks," and he would clarify that he had sex with Ms. Walsh in the bedroom of her apartment on multiple occasions.  Here, Mr. Hopkins appears to argue both a false statement and omission.

Neither qualify as a false statement nor omission.  First, changing the language from "about one month" to "three or four weeks" does not signal "a high degree of awareness of the statements' falsity." *See Russo*, 212 F.3d at 788.  Both pieces of information relay a similar message that it had been a while since Mr. Hopkins had been at the apartment.  Second, Defendants' disclosure that the two had been in a prior sexual relationship does enough that further clarification is not needed.  Indeed, Mr. Hopkins's assertion that the two had sex "multiple times on multiple occasions" in her apartment is just that—Mr. Hopkin's assertion.  The police aren't required to believe every word that Mr. Hopkins told them, and they certainly aren't required to disclose it in a probable-cause affidavit.

Regardless, none of the information here is material.  Finding Mr. Hopkins's sperm DNA at the crime scene is important.  And knowing that the two had a prior relationship and that he had been over to her apartment is also important.  This information was disclosed in the affidavit.  Clarifying that it may have been 28 days instead of 31 days, or adding a precise number of times that the two had been intimate does not change the fair probability that Mr. Hopkins committed this crime.

*****

Taken on their own, none of Mr. Hopkins's seven categories of evidence amount to materially false statements or omissions.  Likewise, for the reasons considered above, none of the seven categories of evidence considered jointly amount to

- 26 -

materially false statements or omissions. As the neutral magistrate found, the presence of sperm DNA specifically on the bathrobe belt used to tie the victim's hands together along with sperm DNA on the nightgown top that she was wearing while killed is enough for probable cause. Mr. Hopkins doesn't actually challenge those crucial facts, but urges for more detailed context and favorable explanations as to the weight that the evidence should hold. His reconstructed affidavit, even if adopted, would not change the fact that there was probable cause to charge him with criminal homicide.

In short, there was probable cause to charge Mr. Hopkins. Summary judgment is appropriate for Defendants as to malicious prosecution because Mr. Hopkins's rights were not violated.

## IV. Defendants are entitled to summary judgment on the fabrication-of-evidence claim.

Mr. Hopkins also brings a related count under Section 1983 for fabrication of evidence. Under the due process clause of the Fourteenth Amendment, criminal defendants have an actionable right against the use of fabricated evidence at trial. *Black v. Montgomery County*, 835 F.3d 358, 370–71 (3d Cir. 2016). "[T]here is a notable bar for evidence to be considered 'fabricated.'" *Id.* at 372. Evidence or testimony that is wrong or disputed does not inherently support a fabricated evidence claim. *Id.* "There must be persuasive evidence supporting a conclusion that the proponents of the evidence are aware that evidence is incorrect or that evidence is offered in bad faith." *Id.* (cleaned up). A criminal defendant must also show that "there is a reasonable likelihood that, without the use of that evidence, [he] would not have been convicted." *Halsey*, 750 F.3d at 294. It would be the "unusual case" where defendants facing a fabricated evidence claim do not get summary judgment in their favor. *Black*, 835 F.3d at 372. Defendants are entitled to summary judgment here.

Here, Mr. Hopkins only briefly (in about two paragraphs of his 50-page brief) explains the basis for his fabrication-of-evidence claim. *See* ECF 57 at 46–47. He does not point to many specifics in the trial record, rather the general argument that Defendants "pretend[ed] that they knew when and how Mr. Hopkins' semen was deposited at the murder scene when they knew that was scientifically impossible." *Id.* at 47. The only testimony that he points to from the trial, without offering a citation, is that Defendants labeled the volume of semen from the crime scene as "substantial." *Id.* Defendants contend that Mr. Hopkins never cited to the record because that testimony never happened. ECF 60 at 5.

As for Mr. Hopkins's general argument, the Court for the same reasons as in its discussion of probable cause does not find that any evidence relating to the discovered semen was fabricated. Mr. Hopkins places different weight on the evidence based on what his expert could conclude and his previous relationship with Ms. Walsh, but that doesn't make the evidence fabricated. There's no record that Defendants offered this evidence in bad faith.

As for Mr. Hopkins's claim about specific testimony, the Court finds that, too, does not rise to the level of fabricated evidence.

First, Mr. Hopkins cannot just make bare assertions and rely on his legal briefing to create a genuine dispute; he must support his allegations with facts from the record. *See Colkitt*, 455 F.3d at 201. Mr. Hopkins's allegation about what was said in trial needs a factual basis to sufficiently combat a summary judgment motion.

Second, in the Court's review of the trial record, it did not uncover where Defendants characterized the volume of semen found as "substantial."

Third, even if Defendants had, it still doesn't rise to the level of fabricated evidence. Ms. Mangan explained that when rating the quality of discovered sperm for DNA testing, her score of 4+ meant "that there are a lot of sperm in there." Ex. Q at 99:10-17. She went on to clarify that her statement did not mean that there was

a high volume of semen found, but a witness could be forgiven for conflating "a lot of sperm" (factually accurate) with "a substantial volume of semen" (factually inaccurate). *Id.* That alone does not signal bad faith. Further, Mr. Hopkins never explained why the Court should view this one line of testimony as so substantial that Mr. Hopkins likely would not have been convicted without it. *See Halsey*, 750 F.3d at 294. This one line is not enough to make this case the "unusual case" where the Court allows a fabrication-of-evidence case to survive summary judgment. *See Black*, 835 F.3d at 372.

Summary judgment is appropriate for Defendants as to the claim of fabrication of evidence.

## V. Defendants are entitled to summary judgment on the conspiracy claim.

Mr. Hopkins's last claim under Section 1983 is for a conspiracy to violate his rights. To prevail under this claim, "a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–152 (1970)). "The elements of a claim of conspiracy to violate federal civil rights are that: (1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States, with the added gloss under § 1983 that the conspirators act under the color of state law." *Id.* at 394 n.15 (citing *Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) (cleaned up)).

Mr. Hopkins contends that the agreement that violated his right was Defendants' agreement that whoever's DNA was found on the nightgown top and bathrobe belt would be the person whom they arrest.  ECF 57 at 48.

The Court finds that deciding to arrest the person whose sperm DNA is found on two places of the victim of an alleged sex crime does not amount to an agreement to deprive an individual of his constitutional rights.  A judgment call on the weight of evidence and an agreement to violate someone's rights are two different things. For many of the same reasons as in the other two counts, summary judgment is appropriate for Defendants here.[5]

## CONCLUSION

For each claim brought, Mr. Hopkins hasn't established the critical elements for his claims to proceed to trial.  The Court will grant summary judgment in Defendants' favor.  A separate order follows.

DATED this 22nd day of April, 2026.

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge

---

[5] Defendants also invoke qualified immunity.  Because Mr. Hopkins hasn't established any constitutional violations, Defendants are also entitled to qualified immunity.  See *Mack v. Yost*, 63 F. 4th 211, 227 (3d Cir. 2023).